IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 12, 2014

**STATE OF TENNESSEE v. NARRELL CHRISTOPHER PIERCE**

**Appeal from the Criminal Court for Davidson County**
**No. 2011-B-1707     Steve R. Dozier, Judge**

_____

**No. M2014-00120-CCA-R3-CD - Filed May 5, 2015**

_____

The Defendant-Appellant, Narrell Christopher Pierce, was convicted by a Davidson County Criminal Court jury of attempted aggravated robbery, attempted second degree murder, employment of a firearm during the commission of a dangerous felony, and unlawful possession of a handgun by a felon.  The trial court sentenced the Defendant to an effective sentence of 51 years' confinement.  On appeal, the Defendant-Appellant argues: (1) the trial court erred in denying the Defendant's motions to suppress (a) the victim's identification testimony, (b) evidence obtained as a result of the Defendant's arrest, and (c) evidence obtained pursuant to a search warrant; (2) the trial court erred in refusing to allow the Defendant to cross-examine a witness about alleged acts of untruthfulness; (3) the trial court erred in denying the Defendant's motion to dismiss count 3 of the indictment and allowing the State to amend that count of the indictment; (4) the evidence is insufficient to sustain the Defendant's convictions of attempted second degree murder and employing a firearm during the commission of a dangerous felony; and (5) the trial court abused its discretion in sentencing the Defendant as a career offender to 51 years' confinement.  Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jeffrey A. DeVasher (on appeal) and Jonathan Wing (at trial), Nashville, Tennessee, for the Defendant-Appellant, Narrell Christopher Pierce.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rachel Sobrero, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

This appeal stems from the attempted robbery of Lewis Street Market on March 15, 2011. The Defendant was implicated in the incident and subsequently indicted by the Davidson County Grand Jury for attempted aggravated robbery, especially aggravated kidnapping, attempted first degree murder, employing a firearm during the commission of or attempt to commit a dangerous felony, possession of a handgun by a convicted felon, and theft of property. Upon the State's motion, the trial court dismissed the especially aggravated kidnapping charge and the theft of property charge.

**Pretrial Motions**. Prior to trial, the Defendant filed several pretrial motions to suppress (1) the victim's identification testimony, (2) evidence obtained as a result of the Defendant's arrest, and (3) evidence obtained pursuant to a search warrant. Specifically, he argued that the identification procedures and circumstances surrounding the photographic lineup identification were "so inherently suggestive that they gave rise to an irreparable risk of misidentification" and that any later identifications were tainted by the initial identification procedures; that the arrest warrant for the Defendant's arrest contained false information; and that the search warrant for the Defendant's Lexus and cellular phone did not establish probable cause.

At the suppression hearings, held on August 28 and September 5, 2012, Anthony Wilfert testified that in March 2011, he was a detective with the Metropolitan Nashville Police Department ("NPD").[1] On March 15, 2011, he responded to a report of a robbery and shootout at the Lewis Street Market. Detective Wilfert met with the victim, Kamil Alakabi, who described the two suspects as African American males.[2] Detective Wilfert also viewed the Lewis Street Market's surveillance video and located shell casings throughout the building.

During his investigation, Detective Wilfert developed the Defendant as a possible suspect and compiled a photographic lineup that included the Defendant. The software used to compile the lineup arranged the photograph of a suspect with five other people matching the description of the suspect. Detective Wilfert entered data for height range, facial hair, race, hair length, and hairstyle consistent with the Defendant. Detective Wilfert then met

---

[1] Throughout the record, the detective's surname is spelled "Wilfert," "Wilfort," and "Wilford." On forms utilized by the detective and at the beginning of his testimony, he provides his surname as "Wilfert." Thus, we will use this spelling.

[2] Throughout the record, the victim's surname is spelled in various ways. We will utilize the spelling from the indictments, "Alakabi."

with the victim to show him the lineup. Prior to showing the victim the lineup, Detective Wilfert advised him that there was no significance to the order of the photographs in the lineup and that he should not assume that the lineup contained a photograph of the suspect. The victim signed a standard police department form indicating that he understood the procedures. Detective Wilfert also told the victim that he could take as much time as he needed to make an identification and that he should not make an identification unless he was "absolutely certain" about his identification.

The victim looked at the lineup for several minutes, and Detective Wilfert "advised him if it were easier[,] . . . to discard those that he knows it is definitely not and to focus on individual photos that he may be comparing." The victim told Detective Wilfert that he was "definitely sure" that four of the photographs did not depict the suspect and that he was still comparing two photographs. Detective Wilfert advised the victim again that "he need[ed] to be absolutely certain that if he cho[se] one, that it was the person that came into his store." The victim then identified photograph number 3, which depicted the Defendant, and stated, "Number 3 looks like him; all others don't resemble him." Detective Wilfert told the victim that he needed to be "100 percent sure" that he identified the correct person, and the victim responded, "That's him, none of the others were him." Detective Wilfert recorded the victim's statement on the identification form in the victim's presence, and the victim signed the form to acknowledge it as his statement.

Based on the victim's identification, Detective Wilfert obtained an arrest warrant for the Defendant. In the affidavit for the arrest warrant, Detective Wilfert indicated that the victim "positively identified" the Defendant as the gunman. The application also stated that Detective Wilfert had compared the Defendant's photograph with the surveillance video, and the gunman appeared to be the Defendant. Detective Wilfert acknowledged that the victim did not state that he was "positive" when he identified the Defendant. He explained that the phrase "positive identification" was used in the police department to mean that a witness chose one of the six photographs in the lineup without assistance or guidance from anyone, and the detective verified that the witness was "certain" that he identified the person who committed the crime. Based on his conversations with the victim, Detective Wilfert believed that the victim positively identified the Defendant. After the Defendant's arrest, Detective Wilfert also obtained a search warrant for the Defendant's vehicle and cellular phone.

On cross-examination, Detective Wilfert agreed that he initially had no suspects in the case and that he released the surveillance video to local news outlets and received a tip that led him to the Defendant. He also agreed that the victim gave an initial description of the suspects to the responding officer and could not recall whether he compared this description to the description he received from the victim. Detective Wilfert insisted that he did not

assist the victim in selecting a particular photograph in the lineup and noted that he verified that the victim was "certain number three is it."

Kamil Alakabi, the owner and operator of Lewis Street Market, testified that on March 15, 2011, two men attempted to rob his store at gunpoint. The victim recalled that at approximately 9:00 p.m. that evening, he was organizing the shelves in his store with one of his employees when two men, later determined to be the Defendant and Travis Bowman, entered the store. They walked directly towards the victim, and the Defendant put a gun in his face. The victim grabbed the gun, and the Defendant punched him and knocked him to the ground. The two men then approached the other employee, and the victim retrieved his own gun. The Defendant fired several shots at the victim, and the victim returned fire. The two men then ran out of the store and fled the scene. The victim immediately called the police to report the incident. He described the suspects and viewed the surveillance video with the responding officers.

The victim recalled being shown a photographic lineup by police and identifying the Defendant as the gunman. He said that he told Detective Wilfert that he was "50 percent sure that's him." He agreed that Detective Wilfert reviewed the procedure forms with him prior to showing him the lineup and that he signed the forms indicating that he understood the procedures. He also agreed that he placed his initials by photograph number 3 and stated at the time, "Number 3 is most like him; the others don't resemble him." The victim attended a subsequent court hearing and identified the Defendant as the man who shot at him and attempted to rob him. He again identified the Defendant as the perpetrator during the suppression hearing.

On cross-examination, the victim agreed that he had never seen the Defendant prior to the robbery. He also agreed that the gunman wore sunglasses and a hat, making it harder to see him, and that the gunman pulled out his gun very quickly and surprised the victim. He recalled that the entire incident happened very quickly and was over within one or two minutes. The victim reiterated that he told Detective Wilfert he was "50 percent certain" that the photograph he selected depicted the gunman. He agreed that seeing the surveillance video and subsequent photographs made him more certain that he had selected the man who shot at him.

Following the hearing, the trial court took the matter under advisement and issued an order on October 4, 2012, denying all three motions.

**Trial.** The victim's testimony at trial was largely consistent with his testimony at the suppression hearing. He clarified that after being knocked to the ground by the Defendant, the Defendant and Mr. Bowman approached the victim's employee and held a gun to his

face. While the perpetrators focused their attention on the other employee, the victim retrieved a nine millimeter handgun from his pocket. Before he could fire any shots, however, the magazine fell out of his gun, and the Defendant began firing his own weapon at the victim. The victim retrieved the magazine and returned fire. The Defendant then continued to shoot at the victim while he and Mr. Bowman fled the store. After the perpetrators fled the store, the victim called 911. Police responded to the scene, interviewed the victim, and collected evidence at the store. During their investigation of the scene, officers collected one 40-caliber cartridge case. Two more 40-caliber shells were later discovered by the victim and collected by NPD officers. The victim also provided police with the surveillance video that captured the incident and turned over his gun for analysis. Several days after the shooting, the victim identified the Defendant in a photographic lineup as the gunman who attempted to rob his store.

Detective Wilfert's testimony was likewise consistent with his testimony at the suppression hearing. As the lead detective assigned to the case, he met with the responding officers and interviewed the victims. The police department's surveillance unit retrieved the surveillance video from the victim's store and released it to local news stations. Several days later, Detective Wilfert received a tip that led him to develop the Defendant as a suspect. He compiled a photographic lineup and showed it to the victim, who identified the Defendant as the gunman. Detective Wilfert obtained an arrest warrant for the Defendant, and the Defendant was arrested the following day, March 18, 2011, at his mother's residence as he exited his vehicle. Inside of the vehicle, police discovered a handgun under the driver's seat. A fingerprint lifted from the gun matched the Defendant, and forensic analysis by the Tennessee Bureau of Investigation revealed that this handgun fired the .40 caliber casings recovered from the Lewis Street Market.

After the Defendant's arrest, police seized the Defendant's vehicle and cellular phone, and Detective Wilfert obtained a search warrant for both pieces of property. Upon searching the Defendant's car, police officers discovered a blue baseball cap, two pairs of sunglasses, and a magazine for a Glock .40 caliber pistol. A series of text messages were recovered from the Defendant's cellular phone and read into evidence. These messages discussed the Defendant taking a "major loss" on his money and having a "near-death" experience as a result of a "shootout."

Travis Bowman, the Defendant's cousin, testified that he was the other individual that entered the Lewis Street Market with the Defendant on March 15, 2011.[3] Earlier that

---

[3] At the time of the Defendant's trial, Mr. Bowman was in custody on charges related to his involvement in the attempted robbery at Lewis Street Market. The record is silent as to the disposition of

(continued...)

evening, they met two other men at an apartment complex in east Nashville, and all four left together in a white Pontiac.[4] Mr. Bowman recalled that during the car ride, the Defendant and the driver of the Pontiac discussed "some money" and said they "needed money." Mr. Bowman claimed, however, that he did not know the Defendant intended to rob the Lewis Street Market. The driver pulled into Lewis Street Market, and the Defendant exited the car and walked towards the store. While looking for his money clip, Mr. Bowman found a handgun on the floorboard of the car and asked the other two passengers whether they had dropped anything. The driver told Mr. Bowman, "[N]o, that's for you. . . . [Y]ou need to get out and help your cousin."

Mr. Bowman exited the vehicle and told the Defendant to "let this go," but the Defendant responded, "I got this," and entered the store. Mr. Bowman followed the Defendant into the store. The Defendant approached the owner and "wrestled [him] to the ground, pulled out the gun, and hit him a few times." As the Defendant approached a second employee in the store, the owner retrieved a gun and "shots began." Mr. Bowman testified that the Defendant shot his weapon first, and the owner returned fire. Mr. Bowman did not fire his gun in the store. The Defendant and Mr. Bowman fled the store and left the scene in the white Pontiac. Mr. Bowman put the gun back on the floorboard of the car and was dropped off at his home. The Defendant told him to "lay low, . . . don't say anything, . . . everything will be alright." Several days later, Mr. Bowman was contacted by police regarding his involvement in the incident.

On cross-examination, Mr. Bowman acknowledged that he had been indicted on a number of counts related to the attempted robbery and, if convicted, would face a lengthy prison sentence. He agreed that he hoped his cooperation with authorities would help him receive a better sentence but denied that he had received any promises in exchange for his testimony. He conceded that after the attempted robbery, he did not contact the police and lied to his family about his involvement. He maintained that he did not know the Defendant intended to rob Lewis Street Market until they pulled into the parking lot and agreed that the Defendant never talked about hurting anyone prior to entering the store.

The State also introduced into evidence recorded phone calls that the Defendant made from the county jail and played them for the jury. In one of those phone calls, the Defendant stated,

---

[3](...continued)
his case.

[4] Police never identified the two other men involved in the attempted robbery.

[T]ell her I said man, tell Travis to shut the f*** up. I don't know what the hell he– just tell her man, they can't – just tell her like this: tell her Chris said the case is beat and she should've took [sic] her a** to court and she would've knew [sic] the case was beat.

In another phone call, the Defendant stated,

Man, how 'bout this, man. My momma done [sic] told me Travis done [sic] ran his mouth with some more sh**.

. . .

Oh, and – and Trav? I swear to God, they better keep his a** in PC. They can record this call or whatever. They better keep his a**- wherever the f*** he at [sic], they better keep him where he at [sic].

Detective Wilfert testified that he understood these phone conversations to be a possible threat directed towards Mr. Bowman, and he notified the Davidson County Sheriff's Office about his concerns.

The State rested its case and the defense did not present any proof. Following deliberation, the jury convicted the Defendant of attempted aggravated robbery, attempted second degree murder, employment of a firearm during the commission of a dangerous felony, and unlawful possession of a handgun by a felon.

Following a sentencing hearing on October 3, 2013, the trial court took the matter under advisement and issued an order on November 2, 2013, sentencing the Defendant as a career offender to 51 years' confinement. On November 25, 2013, the Defendant filed a timely motion for new trial, which was denied by the trial court on December 12, 2013.

It is from this order that the Defendant now appeals.

## ANALYSIS

**I. Motions to Suppress.** The Defendant argues that the trial court erred in denying his motions to suppress (1) the victim's identification testimony, (2) evidence obtained as a result of the Defendant's arrest, and (3) evidence obtained pursuant to a search warrant. The State asserts that the motions to suppress were properly denied.

It is well-established that "'a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.'" State v. Ross, 49 S.W.3d 833, 839 (Tenn. 2001) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). The Tennessee Supreme Court explained this standard:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

Odom, 928 S.W.2d at 23. However, this court's review of a trial court's application of the law to the facts is de novo with no presumption of correctness. State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001) (citing State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999); State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997)).

**A. The victim's identification testimony.** The Defendant argues that the trial court erred in denying his motion to suppress the victim's photographic identification of the Defendant and any subsequent identification testimony by the victim. He asserts that the photographic lineup procedures used by police were so suggestive as to create an irreparable likelihood of misidentification and that any subsequent identification by the victim was tainted by the initial identification procedures.

Our analysis of this issue is based upon the United States Supreme Court holdings in Simmons v. United States, 390 U.S. 377 (1968), and Neil v. Biggers, 409 U.S. 188 (1972). In Simmons, the Court held that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384; see also State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998). The risk of an eyewitness making an incorrect identification is greater if the police show the eyewitness a lineup where a single photograph "is in some way emphasized." Simmons, 390 U.S. at 383. In addition, the risk of misidentification increases "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." Id. This court has noted that "a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar." State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing United States v. Wade, 388 U.S. 218, 233 (1967); Shye v. State, 506 S.W.2d 169, 173 (Tenn. Crim. App.1973); Young v. State, 566 S.W.2d 895, 898 (Tenn. Crim. App. 1978)).

In Biggers, the Court established a two-part analysis which the trial court must apply to determine the validity of a pre-trial identification. 409 U.S. at 198-99. First, the trial court must determine whether the identification procedure was unduly suggestive. Id. at 198. Next, if the trial court determines that the identification procedure was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. Id. at 199. In Tennessee, it is unnecessary to apply the totality of the circumstances test described in Biggers if the trial court determines that the identification procedure was not unduly suggestive. See State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990).

In the present case, the Defendant avers that the photographic lineup was inherently suggestive because the Defendant's photograph depicts a more heavyset person with a more prominent beard and mustache than the other persons depicted in the lineup. Further, he argues that Detective Wilfert's suggestion to the victim to "discard those that he knows it is definitely not" suggested that the assailant was depicted in the lineup. Finally, he maintains that by informing the victim that the Defendant would be arrested, Detective Wilfert suggested that the victim had selected the correct person and thereby tainted any subsequent identification. The trial court denied the Defendant's motion, finding that there "was no proof that the identification utilized by the detective in this case was unduly suggestive as to this identifying witness." The court further found that because the victim made his identification prior to learning that the Defendant would be arrested, his identification was not tainted.

Upon our review of the record, we agree with the trial court and conclude that there was nothing unduly suggestive about the photographic lineup or the overall identification process. The photographic lineup contains photographs of six African American males, all of whom had similar hair styles and facial hair. Each photograph is uniform in size, and none "is in some way emphasized" more than the others. Contrary to the Defendant's claims, he does not appear to be significantly heavier set than the other individuals or to have significantly different facial hair. Rather, all of the individuals have mustaches and appear to be of a fairly similar build. In sum, we conclude that there was nothing about the Defendant's photograph that was "grossly dissimilar" to the photographs of the other men included in the lineup.

Additionally, we agree that the manner of the identification process was not unduly suggestive. Detective Wilfert reviewed the identification procedures with the victim prior to showing him the lineup, and the victim signed a form acknowledging his understanding of these procedures. Detective Wilfert told the victim that the perpetrator's photograph may not be included in the lineup and that he should only select an individual if he was certain that he was the perpetrator. We do not consider Detective Wilfert's statement to the victim

that he could "discard those that he knows it is definitely not" to be unduly suggestive. At no point did Detective Wilfert or anyone else suggest to the victim which photograph to choose. Likewise, we do not view Detective Wilfert's statement that he would seek an arrest warrant for the Defendant as unduly suggestive. This comment was made only after the victim had made an identification of the Defendant and signed a form acknowledging his identification. We fail to see how this post-identification comment impacted the reliability of the victim's identification or tainted any subsequent identifications made by the victim. See State v. Walter Lee "Steve" Allen, No. 03C01-9712-CC-00547, 1999 WL 135051, at *6 (Tenn. Crim. App. Mar. 15, 1999) (finding procedure was not unduly suggestive where "suspect" was written beside the defendant's photograph after the witness made an identification). It is not a rare occasion that the individual selected in a photographic lineup is subsequently arrested and later identified in court by the victim. Finally, we acknowledge that there was conflicting testimony regarding the victim's level of certainty in selecting the Defendant's photograph; however, these inconsistencies went to the credibility of the witness's identification and not to the reliability of the photographic identification. See id. (reasoning that the identifying witness's inconsistencies in her identification went to the credibility of her identification rather than the reliability of her identification). Because we have determined that the identification procedures were not unduly suggestive, we need not assess the reliability of the victim's identification. See Butler, 795 S.W.2d at 686.

**B. Evidence obtained as a result of the Defendant's arrest.** The Defendant next argues that the trial court erred in denying his motion to suppress evidence obtained as a result of his arrest. He contends that the warrant for his arrest was deficient because it was based upon a false statement by Detective Wilfert, and therefore, any evidence seized should be suppressed as the fruits of his illegal arrest.

"Arrest warrants may only issue upon a showing of probable cause." State v. Lewis, 36 S.W.3d 88, 97 (Tenn. Crim. App. 2000) (citations omitted). Indeed, "[i]f the affidavit of complaint . . . establish[es] that there is probable cause to believe that an offense has been committed and that the defendant has committed it, the magistrate or clerk shall issue an arrest warrant[.]" Tenn. R. Crim. P. 4(a). This finding of probable cause "shall be based on evidence which may be hearsay in whole or in part provided there is a substantial basis to believe: (1) the source of the hearsay is credible; and (2) there is a factual basis for the information furnished." Id. 4(b). Probable cause is "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." State v. Henning, 975 S.W.2d 290, 294 (Tenn. 1998) (citing Lea v. State, 181 S.W.2d 351, 352 (Tenn. 1944)). Citizens who witness crimes are presumed to be reliable for probable cause purposes. State v. Williams, 193 S.W.3d 502, 507 (Tenn. 2006) (citing State v. Stephens, 989 S.W.2d 290, 293 (Tenn. 1999); Melson, 683 S.W.2d at 356).

In the instant case, Detective Wilfert's application for an arrest warrant stated that the "incident was captured on video surveillance," and a "photographic lineup was created and shown to the store owner which positively identified the defendant as the shooter." Detective Wilfert also asserted that he had "compared the [D]efendant's mugshot to the video surveillance, and it appear[ed] to be the [D]efendant." The Defendant argues that the arrest warrant was based upon a false statement made by Detective Wilfert, namely that the victim "positively identified" the Defendant as the gunman, thereby rendering the arrest warrant invalid. In support of this contention, the Defendant cites State v. Little, in which the Tennessee Supreme Court held that a "false statement made with intent to deceive the Court, whether material or immaterial to the issue of probable cause," or a "false statement, essential to the establishment of probable cause, recklessly made" would render an affidavit in support of a search warrant invalid. 560 S.W.2d 403, 407 (Tenn. 1978). The Defendant maintains that Detective Wilfert's statement was essential to a finding of probable cause and that it was, at a minimum, recklessly made because the victim never indicated to Detective Wilfert that he was "positive" of his identification. In denying the Defendant's motion to suppress, the trial court rejected this argument and found that there was probable cause to issue the arrest warrant. The court accredited the testimony of Detective Wilfert and found that he "was truthful in his statement that from his perspective[,] the victim had identified the Defendant." Additionally, the court reasoned that other facts, including the detective's "own visual identification of the Defendant in the video and comparison to his mugshot," supported a finding of probable cause.

Initially, we note that Little applies to search warrants, and the Defendant has cited no Tennessee authority for the proposition that its holding applies with equal force to arrest warrants. See State v. William Thomas Johnson, C.C.A. No. 88-112-III, 1989 WL 60384, at *2 (Tenn. Crim. App. June 7, 1989) (expressing doubt that "the twofold inquiry of State v. Little . . . , as applicable to search warrants, also controls as to arrest warrants"). In any event, the record does not preponderate against the findings of the trial court. In fact, our review of the record supports the conclusion that Detective Wilfert's statements were accurate and provided a sufficient basis for probable cause. At the suppression hearing, Detective Wilfert testified that his use of the phrase "positive identification" in the application for an arrest warrant was not represented as a quote by the victim. He explained that the phrase "positive identification" was used in the police department to mean that a witness chose one of the six photographs in the lineup without assistance or guidance from anyone, and the detective verified that the witness was "certain" that he identified the person who committed the crime. Detective Wilfert testified that after explaining the identification procedures to the victim, the victim identified the Defendant as the perpetrator without any assistance. Detective Wilfert verified with the victim that he had selected the correct photograph and emphasized that he needed to be "100 percent certain" about his selection. He recalled that the victim responded, "That's him, none of the others were him." Although

the victim provided conflicting testimony regarding his level of certainty when identifying the Defendant, this conflict in the evidence was properly resolved by the trial court. Odom 928 S.W.2d at 23. Detective Wilfert testified that based on his conversation with the victim, he believed that the victim positively identified the Defendant. Like the trial court, we do not find this characterization of the identification to be a misrepresentation by Detective Wilfert. Further, we agree with the trial court that other facts, such as Detective Wilfert's own visual identification of the Defendant, supported a finding of probable cause.

Moreover, regardless of the validity of the arrest warrant, "an arrest warrant is not required in order to effectuate an arrest for a felony offense." Lewis, 36 S.W.3d at 97 (citations omitted). Thus, "the proper inquiry . . . is not whether the warrant was lawful, but whether the arrest itself was lawful." Lewis, 36 S.W.3d at 98 (citing Harris v. State, 332 S.W.2d 675, 680 (Tenn. 1960); Daugherty v. State, 478 S.W.2d 921, 922 (Tenn. Crim. App. 1972)). An officer may effect a warrantless arrest where "a felony has been committed, and the officer has reasonable cause for believing the person arrested has committed the felony." T.C.A. § 40-7-103(a)(3).[5] Probable cause in this context "exists if, at the time of the arrest, the facts and circumstances within the knowledge of the officers, and of which they had reasonably trustworthy information, are 'sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense.'" State v. Bridges, 963 S.W.2d 487, 491 (Tenn. 1997) (citing and quoting Beck v. Ohio, 379 U.S. 89, 91 (1964); State v. Melson, 638 S.W.2d 342, 350 (Tenn. 1982)) (alterations in Bridges). Courts should determine the existence of probable cause after assessing all of the information available to the officer at the time of arrest. State v. Woods, 806 S.W.2d 205, 212 (Tenn. Crim. App. 1990).

Here, Detective Wilfert responded to the scene of the attempted robbery and interviewed the victims, who provided descriptions of the two suspects. Detective Wilfert also reviewed the surveillance video of the robbery. After receiving a tip, Detective Wilfert developed the Defendant as a possible suspect.[6] He compared the surveillance video footage

---

[5] Tennessee courts make "little, if any, distinction between the terms 'reasonable cause' and 'probable cause' in determining whether there exists a basis for an arrest." State v. Robert A. Cummins, No. W2000-00277-CCA-R3-CD, 2001 WL 912792, at *5 (Tenn. Crim. App. Aug. 10, 2001) (citing State v. Melvin, 638 S.W.2d 342, 350 (Tenn. 1982)); see also State v. Tays, 836 S.W.2d 596, 598 (Tenn. Crim. App. 1992) ("The Tennessee Supreme Court does not differentiate between the term 'reasonable cause' and the term 'probable cause' when analyzing the validity of a warrantless arrest." (citing Melvin, 638 S.W.2d 342)).

[6] The record provides minimal details regarding the tip received by police after releasing the surveillance video to local news outlets. Based on testimony during trial, it appears that the tip came from co-defendant Bowman's father, who informed police that he believed his son, Travis Bowman, was one of
(continued...)

to a photograph of the Defendant and determined that he was the gunman depicted in the video. The trial court accredited Detective Wilfert's testimony that the victim identified the Defendant as the gunman. However, even absent this identification, the other information available to Detective Wilfert at the time of the Defendant's arrest was "sufficient to warrant a prudent man in believing that the [Defendant] had committed" the offenses. See Bridges, 963 S.W.2d at 491. Accordingly, the trial court did not err in denying the Defendant's motion to suppress.

**C. Evidence obtained pursuant to the search warrant.** The Defendant next argues that the trial court erred in denying his motion to suppress evidence obtained pursuant to a search warrant. He avers that the affidavit in support of the warrant failed to establish probable cause and included no showing that co-defendant Bowman was a reliable witness.

In analyzing this issue, we are guided by the following well-established principles of Fourth Amendment jurisprudence. "When reviewing the issuance of a search warrant, this court must determine whether the magistrate had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing." State v. Hayes, 337 S.W.3d 235, 256 (Tenn. Crim. App. 2010). "This court may consider only the affidavit in reviewing whether the issuance of a search warrant is based upon probable cause. We may not consider any evidence that was not included in the affidavit but was known by the affiant or provided to or possessed by the issuing magistrate." State v. Smotherman, 201 S.W.3d 657, 661 (Tenn. 2006) (citations omitted). "The magistrate's judgment is entitled to great deference on appeal." Hayes, 337 S.W.3d at 256.

The United States and Tennessee Constitutions state that search warrants shall issue only upon probable cause. U.S. Const. amend. IV; Tenn. Const. art. 1, § 7. "As a general rule, a search warrant shall be issued only on the basis of an affidavit, sworn before a 'neutral and detached' magistrate, which establishes probable cause for its issuance." State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999) (quoting State v. Jacumin, 778 S.W.2d 430, 431 (Tenn. 1989)) (citing State v. Moon, 841 S.W.2d 336, 338 (Tenn. Crim. App. 1992)). A showing of probable cause generally requires "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." State v. Johnson, 854 S.W.2d 897, 899 (Tenn. Crim. App. 1993) (citing Lea v. State, 181 S.W.2d 351, 352 (Tenn. 1944)). "In order to establish probable cause, an affidavit must set forth facts from which a reasonable conclusion

---

[6](...continued)
the perpetrators depicted in the surveillance video. Neither the Defendant nor the State addressed the reliability of the tip or how it led police to suspect the Defendant as one of the perpetrators. Regardless, Detective Wilfert's application for an arrest warrant did not rely on the tip to establish probable cause, and neither the trial court nor this court place any significance on the tip in the probable cause analysis.

may be drawn that the contraband will be found in the place to be searched pursuant to the warrant." State v. Norris, 47 S.W.3d 457, 470 (Tenn. Crim. App. 2000) (citing State v. Longstreet, 619 S.W.2d 97, 99 (Tenn. 1981)). "A person aggrieved by an unlawful or invalid search or seizure may move the court pursuant to Rule 12(b) [of the Tennessee Rules of Criminal Procedure] to suppress any evidence obtained in the unlawful search or seizure." Tenn. R. Crim. P. 41(g).

"To establish probable cause, the affidavit must show a nexus among the criminal activity, the place to be searched, and the items to be seized." State v. Saine, 297 S.W.3d 199, 206 (Tenn. 2009) (citing State v. Reid, 91 S.W.3d 247, 273 (Tenn. 2002); State v. Smith, 868 S.W.2d 561, 572 (Tenn. 1993)). The Tennessee Supreme Court explained that when determining whether a sufficient nexus has been established, reviewing courts should "'consider whether the criminal activity under investigation was an isolated event or a protracted pattern of conduct[,] . . . the nature of the property sought, the normal inferences as to where a criminal would hide the evidence, and the perpetrator's opportunity to dispose of incriminating evidence.'" Saine, 297 S.W.3d at 206 (quoting Reid, 91 S.W.3d at 275). Where the affidavit contains no direct evidence of such a nexus, we must determine "whether it was reasonable for the magistrate to infer that the items of contraband listed in [the] affidavit would be located" in the place to be searched. Saine, 297 S.W.3d at 206.

"When courts review an affidavit used to establish probable cause for a search warrant, a distinction is made between information provided by 'citizen' or 'bystander' informants and information provided by 'criminal informants' or an informant from a 'criminal milieu.'" State v. Williams, 193 S.W.3d 502, 507 (Tenn. 2006) (citing State v. Stevens, 989 S.W.3d 290, 293 (Tenn. 1999)). While information provided by a citizen informant is presumed reliable, Stevens, 989 S.W.3d at 293, information by a criminal informant must be examined under the two-part analysis adopted in State v. Jacumin, 778 S.W.2d 430 (Tenn. 1989). Under this test, the affidavit must set out "(1) the basis for the informant's knowledge, and either (2)(a) a basis establishing the informant's credibility or (2)(b) a basis establishing that the informant's information is reliable." State v. Ballard, 836 S.W.2d 560, 562 (Tenn. 1992) (citation omitted). "Probable cause may not be found until both prongs have been independently considered and satisfied." Id. (citation omitted).

In the instant case, the affidavit contained the following "Statement of Facts in Support of Probable Cause":

> On 3/15/11[,] [the Defendant] and a co-defendant walked into the Lewis Street Market located at 37 Lewis Street Nashville, [Tennessee] . . . and attempted to rob the owner. Once inside, a short struggle ensued and the owner was able to retrieve a handgun from his person. [The Defendant] then fired one round

at the owner. The owner returned fire in self[-]defense and [the Defendant] and the co-defendant were able to flee the location. After speaking with a co-defendant[,] which [sic] made statement's [sic] against his own interest, he indicated that he and [the Defendant] had used [the Defendant]'s 1991 Lexus LS400 to commit another local robbery and had discussed the robberies via cellular telephone afterwards.

In denying the Defendant's motion to suppress, the trial court made the following findings and conclusions:

> The Court finds there was sufficient probable cause to support the search warrant [of the Defendant's vehicle and cellular phone]. The [C]ourt finds that the co-defendant's statement to the police supports the probable cause that the vehicle had been used in this robbery as well as other robberies, thus the word "another." Further, the information was that the [D]efendant had used the cellular telephone to discuss the robberies which had occurred within the week. The Court finds the affidavit contained sufficient information for the issuing judge to have found probable cause for the issuance of the warrant. The search warrant contained clear probable cause with an appropriate nexus between the robbery and the locations to be searched. The information in the warrant was not stale.

We must begin our analysis by recognizing that the source of information establishing probable cause in the affidavit is the co-defendant in this case. The Tennessee Supreme Court recently confirmed that "statements of a person who confesses to a crime and implicates another in the process" should not be considered "presumptively reliable." State v. Bishop, 431 S.W.3d 22, 39 (Tenn. 2014) (citing Lewis, 36 S.W.3d at 99 (holding that a "Jacumin analysis is necessary" when the informant is the defendant's accomplice)). Rather, the State must satisfy the two-pronged Aguilar-Spinelli test, demonstrating both the informant's basis of knowledge and the veracity of the information. Id. at 38 (citing Jacumin, 778 S.W.2d at 436). In Bishop, the Tennessee Supreme Court explained,

> The "basis of knowledge" prong involves how the informant came to know the information he or she claims to know. The "veracity" prong requires facts that demonstrate either that the informant is personally credible or that the information itself is reliable. The credibility of the informant's information may also be buttressed by independent corroboration of its details. However, it is not necessary to corroborate every detail of the informant's information or to "directly link the suspect to the commission of the crime." Corroboration of "only innocent aspects of the story" may suffice.

-15-

Id. (internal citations removed). The court has cautioned against "excessively technical" applications of the Aguilar-Spinelli test, emphasizing that it is intended as a guide rather than a set of "inflexible, independent requirements." Id. (citing Jacumin, 788 S.W.2d at 433). The task of the issuing magistrate is to make "a practical, commonsense decision whether, given all of the information set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." State v. Moon, 841 S.W.2d 336, 339 (Tenn. Crim. App. 1992) (quoting Illinois v. Gates, 462 U.S. 213, 238-39 (1983)); see also Jacumin, 778 S.W.2d at 435, n.2; State v. Bryan, 769 S.W.2d 208 (Tenn. 1989). Thus, a reviewing court's duty is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. (quoting Gates, 462 U.S. at 239) (alterations in Moon).

In the present case, we note that the trial court failed to make any specific findings of fact in the record regarding the co-defendant-informant's basis of knowledge or veracity as required under Jacumin. "When a trial court does not set forth its findings of fact upon the record of the proceedings, the appellate court must decide where the preponderance of the evidence lies." State v. Bobby Killion, No. E2008-01350-CCA-R3-CD, 2009 WL 1748959, at *13 (Tenn. Crim. App. June 22, 2009), perm. app. denied (Tenn. Oct. 26, 2009) (citing Fields v. State, 40 S.W.3d 450, 457 n.5 (Tenn. 2001)). Accordingly, we will review this issue de novo with no presumption of correctness.

Turning first to the "basis of knowledge" prong, we conclude that the affidavit sufficiently established that the co-defendant had first-hand knowledge of the robbery and the location of evidence because of his participation in the robbery. Although the affiant used the phrases "a co-defendant" and "the co-defendant" interchangeably, a commonsense reading of the affidavit indicates that there was only one co-defendant involved in the string of robberies alleged in the affidavit. The co-defendant stated that he and the Defendant used the Defendant's vehicle in "another robbery" and discussed these robberies via text message on a cellular phone. This information sufficiently established the co-defendant's basis of knowledge.

Regarding the "veracity" prong, however, the affidavit failed to indicate the basis of the co-defendant's credibility or the reliability of his information. The affidavit made no claim that the co-defendant had previously provided accurate information to law enforcement or was otherwise credible, such that a magistrate could infer that his information was reliable because he was a credible person. See Moon, 841 S.W.2d at 339. Indeed, by implicating himself in the robbery, the co-defendant inserted himself into the "criminal milieu" and placed "a question mark over both [his] character and [his] veracity." See Bishop, 431 S.W.3d at 39-40 (citing State v. Moon, 841 S.W.2d 336, 339-40 (noting that "[g]enerally, one

-16-

could infer that a person who has committed a crime may be less honest or less worthy of belief than a person who has not")). Likewise, the mere fact that the affidavit stated that the co-defendant gave information against his penal interest did not establish the reliability of the information provided. See Moon, 841 S.W.2d at 340 ("[A]bsent the affidavit . . . providing how the admission against interest relates to the criminal activity, the targeted premises or the defendant, it carries no weight toward enhancing the reliability of the informant's information."). The affidavit in this case did not disclose how the co-defendant's statements against his penal interest related to his credibility or the reliability of the information.

The State acknowledges that the affidavit was "less clear" in setting out the veracity of the co-defendant's information but argues that his statements were sufficiently corroborated by police. Specifically, the State argues that because the affiant was aware of the details of the attempted robbery at the Lewis Street Market, as set out in the beginning of the affidavit, the degree to which the co-defendant's incriminating statements matched the known details of the offense established the veracity of the information. Indeed, independent police corroboration may compensate for deficiencies in the veracity prong. See Jacumin, 778 S.W.2d at 436. However, the affidavit before us failed to provide such corroboration. While the co-defendant's incriminating statement may have matched the details of the attempted robbery, such facts were not included in the affidavit. Thus, the inclusion of the details of the robbery in the affidavit did not bolster the reliability of the co-defendant's statements at all. Likewise, the affidavit does not specify any of the information provided by the co-defendant which was corroborated by police. We emphasize that "it is the magistrate, not the police officers, who must determine that there are sufficient circumstances to require a search." Moon, 841 S.W.2d at 342. Thus, "the affiant must make a sufficient disclosure of the events, activities, or allegations which have been corroborated in order that the magistrate may make a neutral and detached determination that the informant is credible or that his information is reliable." Id. at 341. Here, we cannot conclude that the information contained in the affidavit provided sufficient probable cause. Accordingly, it was error for the trial court to deny the Defendant's motion to suppress evidence obtained as a result of the search warrant.

Error notwithstanding, the Defendant is not entitled to relief unless the error more probably than not affected the judgment. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."); Momon v. State, 18 S.W.3d 152, 164 (Tenn. 1999) ("'[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.'") (quoting Delaware v. Van Arsdall, 475 U.S. 673,

681 (1986)); see also State v. Valentine, 911 S.W.2d 328, 333 (Tenn. 1995) (applying the harmless error doctrine to the admission of illegally obtained evidence).

In this case, the search warrant yielded a blue hat, two pairs of sunglasses, a magazine for a .40 caliber pistol, and three text messages. While these items were certainly incriminating, there was substantial evidence, in addition to the evidence obtained as a result of the search warrant, upon which the jury could find the Defendant guilty. The robbery was captured by surveillance video, which was shown to the jury. In the video, the Defendant and co-defendant Bowman are seen engaging in a shootout with the victim, who later identified the Defendant as the shooter in a photographic lineup and at trial. A gun was recovered from the Defendant upon his arrest, and ballistic analysis matched this gun to shell casings recovered at the scene. Additionally, co-defendant Bowman testified at trial that he was the other perpetrator involved in the robbery and identified the Defendant as the shooter. Based upon this evidence, we conclude beyond a reasonable doubt that the erroneous admission of the evidence obtained pursuant to the invalid search warrant did not affect the verdict. The Defendant is not entitled to relief on this issue.

**II. Cross-Examination of Detective Wilfert.** The Defendant argues that the trial court erred by not allowing him to cross-examine Detective Wilfert about an alleged incident of dishonesty related to his resignation from the NPD under Tennessee Rule of Evidence 608. The State responds that the trial court did not abuse its discretion because the Defendant failed to establish a factual basis for the alleged conduct or that the alleged conduct was probative of the detective's truthfulness. We agree with the State that the trial court did not abuse its discretion.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010) (citing State v. Lewis, 235 S.W.3d 136, 141 (Tenn. 2007)). A trial court is found to have abused its discretion when it "applies an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" Lewis, 235 S.W.3d at 141 (quoting State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006)).

Rule 608(b) of the Tennessee Rules of Evidence governs the admissibility of a witness's prior conduct for impeachment. Under Rule 608(b), a witness may be impeached using specific instances of conduct during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness. Tenn. R. Evid. 608(b). "If the witness denies the conduct, the party proffering the evidence must be satisfied with that response and may not seek to prove the conduct by extrinsic evidence." State v. Wyrick, 62 S.W.3d 751, 780 (Tenn. Crim. App. 2001) (citing Tenn. R. Evid. 608(b)).

-18-

In the present case, the State filed a motion in limine requesting a jury-out hearing to determine the admissibility of all prior bad act evidence. As relevant here, the State requested a hearing pursuant to Tennessee Rule of Evidence 608 regarding alleged acts of dishonesty by Detective Wilfert resulting in his resignation from the NPD. At the pretrial hearing on the motion, Detective Wilfert denied that his conduct involved dishonesty, stating "I was never not honest." He agreed that he entered Sergeant Lee Kendall's office when he was not present but asserted that Sergeant Kendall asked him to enter his office to place a file on his desk. He also agreed that he used a copy of a master key to enter the office but denied that he was not "supposed to have a key to those offices." Detective Wilfert acknowledged that he was no longer assigned to the investigations department and that Sergeant Kendall asked him to turn in all of his "issued keys." He maintained, however, that he believed he was entitled to keep his copied key, stating "[T]he original key . . . was available to all detectives and to my knowledge still is. The key that I made a copy of I kept and I was going to relinquish to another detective when I left that precinct." Detective Wilfert conceded that he looked at a file on Sergeant Kendall's desk but denied that he entered the office with the intent to look at the file or that he removed anything from the file.

Detective Wilfert agreed that he signed an internal disciplinary form indicating that he was "guilty of the reported behavior and investigative findings." He claimed that he only signed the form to avoid being terminated. He noted that the form did not contain an admission that he was dishonest or untruthful; the form indicated that he was "guilty of entering Sergeant Kendall's office without his knowledge," which constituted "conduct unbecoming of an employee of the department." Detective Wilfert stated that he "agreed to sign [the admission form] and . . . resigned in good standing with the police department."

Sergeant Lee Kendall testified that Detective Wilfert worked under his supervision for a period of time before Detective Wilfert was reassigned to patrol in Hermitage. He recalled that he asked Detective Wilfert if he had any keys to the investigations office and that Detective Wilfert stated that he did not. Sergeant Kendall believed that Detective Wilfert should have understood that he was referencing any keys to the investigations department and not solely "issued keys." He agreed that other officers may have copied the master key but was not aware of anyone specifically. He also testified that Detective Wilfert entered his office without his permission. He did not recall that Detective Wilfert left any paperwork for him and said he learned of the incident when another employee told him that Detective Wilfert stated that he was going to go into Sergeant Kendall's office to get something.

Following the hearing, the trial court took the matter under advisement and issued an order finding that the Defendant had not presented impeaching information properly authorized under Tennessee Rule of Evidence 608. The court premised its ruling on the

probative value of the evidence, emphasizing that "the pending case . . . is not going to turn into a trial about whether Officer Wilf[ert] turned in all of his keys."  The court allowed the Defendant to raise this issue again at a jury-out hearing at trial, during which Detective Wilfert testified consistently with his testimony from the pretrial hearing.  Following this testimony, the trial court found "nothing different . . . from a proffer standpoint" and refused to allow the Defendant to question Detective Wilfert about his resignation from the NPD.  The court noted that Detective Wilfert adamantly denied any acts of dishonesty or untruthfulness and expressed concern that the jury would hear about "this great resignation and . . . have no clue that it's all about some key or where [Detective Wilfert] went in [an office] and took a piece of paper off a desk."  The court further stated:

> Even if that [conduct] dealt with the character traits, the truthfulness, which I don't find that it does, I do not think the probative value of that on the issue of truthfulness or untruthfulness is sufficient to get into the disputed factual space of it.  And I understand even if a witness disputes a question that does deal with truthfulness or untruthfulness that this question can be asked and the proponent of that question is stuck with the answer.

> And that's – the probative value of this, it doesn't have any.  This witness can be asked about, and he was asked about, the statements he made to Mr. [Alakabi] and what Mr. [Alakabi] told him.  And whether it was 100 percent or 50 percent and the differences between [a] statement and the detective's testimony, and whatever weight the jury wants to put on that can be put on that.  That issue can be made regardless of this issue over what[] he's resigned for.  So I don't think there is – a sufficient basis has been shown that involves untruthfulness or truthfulness issues based on the proffer.

Upon our review, we cannot conclude that the trial court abused its discretion in limiting the Defendant's cross-examination of Detective Wilfert.  Like the trial court, we question whether Detective Wilfert's conduct involved acts of dishonesty admissible under Rule 608.  Detective Wilfert testified that he resigned in good standing after signing an admission form indicating he was guilty of "conduct unbecoming of an officer" and that the admission specifically excluded a finding of dishonesty or untruthfulness.  He stated that Sergeant Kendall asked him to turn in any "issued keys."  He did not believe that the copy he made of the master key fell within that description because it was not issued to him by the department.  Further, Detective Wilfert adamantly denied that his resignation resulted from dishonest or untruthful conduct during both hearings on the matter.  He indicated that if cross-examined about this issue, he would deny any dishonest conduct.  Given Detective Wilfert's denial, we agree with the trial court that there was little probative value to the evidence.  See Tenn. R. Evid. 608, Advisory Comm'n Cmts (noting that Rule 608(b) requires

"analytical weighing of probative value versus unfair prejudice"); see also State v. Angela Manning, No. 03C01-9501-CR-00012, 1998 WL 103317 (Tenn. Crim. App. Feb. 27, 1998) (concluding that the court acted within its discretion in preventing the defendant from questioning a witness about alleged acts of dishonesty where the witness denied the conduct in a jury-out hearing).  Accordingly, we discern no abuse of discretion.

**III.  Motion to Dismiss Count 3 of the Indictment.**  The Defendant argues that the trial court erred by denying the Defendant's motion to dismiss count 3 of the indictment and allowing the State to amend the indictment to specify the predicate felony underlying the employment of a firearm during a dangerous felony charge.[7]  The State responds that the trial court acted within its discretion in denying the motion and allowing the amendment.  We agree with the State.

The United States Constitution and the Tennessee Constitution state that a defendant is entitled to knowledge of "the nature and cause of the accusation."  U.S. Const. amend. VI; Tenn. Const. art. I, § 9.  The Tennessee Supreme Court has stated that an indictment is valid if it contains sufficient information "(1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy."  State v. Hill, 954 S.W.2d 725, 727 (Tenn. 1997) (citing State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991); VanArsdall v. State, 919 S.W.2d 626, 630 (Tenn. Crim. App. 1995); State v. Smith, 612 S.W.2d 493, 497 (Tenn. Crim. App. 1980)).  In addition, pursuant to Tennessee Code Annotated section 40-13-202, the indictment must

> state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner so as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment. . . .

T.C.A. § 40-13-202 (2006); see also State v. Hammonds, 30 S.W.3d 294, 300 (Tenn. 2000) (stating that the "overriding purpose" of an indictment is to provide "notice to the accused").  The trial court may allow the State to amend an indictment, without the defendant's consent and before jeopardy is attached, "if no additional or different offense is charged and no substantial right of the defendant is prejudiced."  Tenn. R. Crim. P. 7(b)(2).  While a challenge to the legal sufficiency of an indictment presents a question of law subject to de novo review, State v. Wilson, 31 S.W.3d 189, 191 (Tenn. 2000), the grant or denial of a motion to amend is a matter within the discretion of the trial court.  State v. Kennedy, 10

---

[7] This count was originally numbered count 4 but was renumbered to count 3.

S.W.3d 280, 283 (Tenn. Crim. App. 1999). This court will alter the trial court's decision only upon an abuse of discretion. Id.

Here, the original count of the indictment charging the Defendant with employment of a firearm during a dangerous felony provided, in relevant part, that the Defendant "did knowingly employ a firearm during the commission of or the attempt to commit a dangerous felony as defined in Tennessee Code Annotated § 39-17-1324(b), and against the peace and dignity of the State of Tennessee." Prior to trial, the Defendant filed a motion to dismiss this count for failure to give notice of the predicate felony. At the hearing on the matter, the State responded that the indictment placed the Defendant on notice because it contained only a single count qualifying as a dangerous felony under Tennessee Code Annotated section 39-17-1324: attempt to commit first degree murder. The Defendant agreed that he was aware that only one count in the indictment could be the predicate felony but maintained that the court should dismiss the indictment and opposed any amendment by the State. The trial court found that the indictment provided sufficient notice of the predicate felony but allowed the State to amend the indictment "so that everyone's clear, including the jury, so there's no confusion about that."

We begin our analysis by noting that the original count, notwithstanding its failure to specify the predicate felony, was not void because it served its "overriding purpose" of providing notice to the Defendant. In so noting, we recognize that "[g]enerally, an indictment for a violation of [Tennessee Code Annotated] section 39-17-1324 that does not name the underlying dangerous felony does not provide the defendant with adequate notice of the crime charged." State v. Demeko Gerard Duckworth, No. M2012-01234-CCA-R3-CD, 2013 WL 1933085, at *21 (Tenn. Crim. App. May 10, 2013). This is so because the statute provides 11 options for dangerous felonies that would support the conviction and, thus, "leaves the defendant with inadequate notice of the charges against him." Id.; see T.C.A. § 39-17-1324(h)(2)(i)(1). However, where the indictment, as does the one in this case, includes only one count that qualifies as a dangerous felony under section 39-17-1324, the indictment is not void for lack of notice. See Demeko Gerard Duckworth, 2013 WL 1933085, at *22 (concluding that because only one count in the indictment, attempted first degree murder, qualifies as a dangerous felony under section 39-17-1324, "it is 'reasonably clear' that the charge of employing a firearm during the commission of a dangerous felony is connected to the count of attempted first degree murder such that the indictment is not void for lack of notice") (citing and quoting State v. Youngblood, 287 S.W.2d 89, 91 (Tenn. 1956) (holding that "where it is reasonably clear from the averments of the second count that this is connected with and a part of the preceding count . . . such a count may be considered good")); cf., State v. Willie Duncan, No. W2013-02554-CCA-R3-CD, 2014 WL 4243746, at *9 (Tenn. Crim. App. Aug. 27, 2014) (concluding that an indictment for employing a firearm during the commission of a dangerous felony without specifying the predicate felony

failed to provide adequate notice where the defendant was charged with multiple felonies that could qualify as dangerous felonies under the statute).

In any event, the State properly amended the indictment in accord with the requirements of Tennessee Rule of Criminal Procedure 7(b)(2). Although the Defendant opposed the amendment, it occurred before the jury was sworn, the point at which jeopardy attaches in a jury trial. State v. Pennington, 952 S.W.2d 420, 422 (Tenn. 1997) (citing Crist v. Bretz, 437 U.S. 28, 35 (1978); Serfass v. United States, 420 U.S. 377, 388 (1975)). Additionally, the indictment already charged the Defendant with attempted first degree murder, and thus, amending count 3 to specify this charge as the predicate felony underlying the count for employment of a firearm during the commission of a dangerous felony did not charge an additional or different offense. Further, no substantial right of the Defendant was prejudiced by the amendment because, as previously discussed, the original indictment accomplished the "overriding purpose" of providing the Defendant with notice of the charges against him. Accordingly, the trial court did not abuse its discretion in allowing the amendment of the indictment. The Defendant is not entitled to relief on this issue.

**IV. Sufficiency of the Evidence.** The Defendant argues that the evidence is insufficient to support his convictions for attempted second degree murder and employing a firearm during the commission of or attempt to commit a dangerous felony because it fails to establish that he knowingly attempted to kill the victim. The State responds that the evidence established beyond a reasonable doubt that the Defendant acted knowingly. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial

evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

The Defendant first challenges the sufficiency of the evidence supporting his attempted second degree murder conviction. He concedes that he fired three shots in the victim's "general direction" but argues that these shots were not aimed at, nor intended to strike, the victim. Thus, he argues, the evidence fails to establish beyond a reasonable doubt that he intended to knowingly kill the victim.

Second degree murder is defined as "[a] knowing killing of another[.]" T.C.A. § 39-13-210(a)(1). Second degree murder is a result-of-conduct offense because the statute "'focuses purely on the result and punishes an actor who knowingly causes another's death.'" State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010) (quoting State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000)). To prevail on a charge of attempted second degree murder, the State was required to prove that the Defendant acted with the intent to knowingly kill another and took a substantial step toward doing so. T.C.A. § 39-12-101. "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. § 39-11-302(b). Whether a defendant acts knowingly in killing another is a question of fact for the jury. Brown, 311 S.W.3d at 432; State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer intent from the character of the assault, the nature of the act, and from all of the circumstances of the case in evidence. Inlow, 52 S.W.3d at 105 (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

Viewed in the light most favorable to the State, the evidence shows that the Defendant and co-defendant Bowman entered the Lewis Street Market and approached the victim in an attempt to rob him. The Defendant put a gun in the victim's face, and a brief struggle ensued, during which the Defendant pushed the victim to the ground. While the Defendant approached another employee in the store, the victim retrieved his own gun and attempted to fire at the Defendant, but the magazine fell out of his gun. At this point, the Defendant fired his gun in the direction of the victim, and the victim returned fire. The Defendant and

co-defendant Bowman ran toward the entrance of the store, and the Defendant fired his weapon two more times in the direction of the victim before exiting the store. Although the Defendant claims that he did not attempt to knowingly kill the victim because he did not aim at him, this was a question of fact for the jury. See Brown, 311 S.W.3d at 432. From this evidence, a rational juror could have inferred that the Defendant acted with the intent to commit the knowing killing of the victim and that his conduct, shooting at the victim, constituted a substantial step towards that end.

The Defendant also challenges the sufficiency of the evidence supporting his conviction for employment of a firearm while attempting to commit a dangerous felony. This argument is likewise premised on the Defendant's contention that the evidence is insufficient to establish that he intended to knowingly kill the victim. In other words, he asserts that because the evidence is insufficient to support his conviction for the predicate felony underlying the conviction for employing a firearm during an attempt to commit a dangerous felony, his conviction cannot stand.

Employing a firearm during an attempt to commit a dangerous felony is a Class C felony. T.C.A. § 39-17-1324(b)(2), (h)(1). Attempted second degree murder is defined as a dangerous felony pursuant to section 39-17-1324. As previously noted, second degree murder is the "knowing killing of another." Id. § 39-13-210(a)(1). The evidence at trial established that the Defendant entered the victim's store with a gun and fired three shots at him before fleeing the scene. Because this evidence is sufficient to sustain the Defendant's conviction for attempted second degree murder, the Defendant's argument is without merit.

**V. Sentencing.** The Defendant argues that the trial court erred by sentencing him as a career offender, enhancing the length of his sentences, and imposing consecutive sentences. The State responds that the trial court acted within its discretion, and the Defendant has failed to show that his sentence is unreasonable.

The 2005 amendments to the sentencing act "served to increase the discretionary authority of trial courts in sentencing." State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In light of this broader discretion, "sentences should be upheld so long as the statutory purposes and principles, along with any applicable enhancement and mitigating factors, have been properly addressed." Id. at 706. Moreover, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. Therefore, this court reviews a trial court's sentencing determinations under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range

-25-

sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

Pursuant to the 2005 amendments to the sentencing act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

> (1) The evidence, if any, received at the trial and the sentencing hearing;
> (2) The presentence report;
> (3) The principles of sentencing and arguments as to sentencing alternatives;
> (4) The nature and characteristics of the criminal conduct involved;
> (5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
> (6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
> (7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

T.C.A. § 40-35-210(b). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401(d), Sentencing Comm'n Cmts. In determining the proper sentence, the trial court must consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102, -103. In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

**A. Career Offender Status.** The Defendant first contends that the trial court improperly classified him as a career offender based upon offenses he committed as a juvenile. He argues that use of his prior convictions for enhancement purposes runs afoul of the purposes and principles of the sentencing act and violates the constitutional protections against cruel and unusual punishment. In support of his constitutional claim, he cites the United States Supreme Court's decision in Graham v. Florida, 560 U.S. 48 (2010), where the Court held that the Eighth Amendment prohibits a sentence of life without parole for juveniles who commit nonhomicide offenses. The Defendant argues that the reasoning in Graham likewise should prevent "enhancement of his sentence from Range I to career offender status based solely on acts he committed as a juvenile."

A defendant qualifies as a career offender if that defendant has received any combination of six or more Class A, B, or C felony convictions prior to the offense for which the defendant is being sentenced and if the offense for which the defendant is being sentenced is also a Class A, B, or C felony. T.C.A. § 40-35-108(a)(1). Likewise, a defendant

qualifies as a career offender if he has received any combination of four (4) Class A or Class B felony convictions and the offense for which he is being sentences is a Class A or B felony. Id. § 40-35-108(a)(2). Felony offenses committed by the defendant as a juvenile are considered prior offenses so long as the defendant was convicted of those felony offenses in criminal court. Id. § 40-35-108(b)(3)(A). Convictions for multiple felonies committed within the same twenty-four hour period constitute one conviction for purposes of determining prior convictions except for convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim or convictions for aggravated burglary. Id. § 40-35-108(b)(4). If the trial court finds beyond a reasonable doubt that the defendant is a career offender, the court must impose the maximum sentence within the applicable Range III. Id. § 40-35-108(c).

At the sentencing hearing, the State entered into evidence certified copies of the Defendant's prior felony convictions showing four prior convictions for aggravated robbery, Class B felonies, and three prior convictions for attempted aggravated robbery, Class C felonies. See T.C.A. §§ 39-13-402(b), -12-107(a). The trial court found that the Defendant committed these offenses while he was a juvenile; however, because each resulted in a conviction in criminal court, the court considered them "prior convictions" for the purposes of determining the Defendant's appropriate sentencing range. The court also found that although the offenses were all committed on two dates, they should be "excluded from the exception for felonies committed within the same 'twenty-four-hour period' because . . . [e]ach of the [D]efendant's prior felonies . . . ha[s] elements of threatened bodily injury or serious bodily injury." Based on these findings, the court found beyond a reasonable doubt that the Defendant is a career offender.

Notwithstanding these findings, which the Defendant does not dispute, the Defendant asserts that the trial court erred in sentencing him as a career offender based solely on his convictions as a juvenile. He seemingly challenges the propriety of the statute, arguing that because trial courts have discretion whether to transfer cases from juvenile court to criminal court, the statute "creates unjustified disparities and inequalities in sentencing" in conflict with the purposes and principles of the sentencing act. However, he cites no further authority to support this proposition and ignores the legislature's clear intent that such convictions be used in determining the appropriate range. Indeed, the Comments of the Sentencing Commission state that "[t]he maximum sentence and parole eligibility for persons having this type of extensive criminal record is in keeping with the sentencing purposes set forth in § 40-35-102." T.C.A. § 40-35-108, Sentencing Comm'n Cmts. Thus, even if we agreed with the Defendant, we are unable to provide him relief.

The Defendant further argues that, based upon the United States Supreme Court's ruling in Graham, the trial court's categorization of him as a career offender based solely on

his juvenile offenses violates the constitutional protections against cruel and unusual punishment. In Graham, a 16-year-old defendant was convicted as an adult for armed burglary and attempted armed robbery and sentenced to life imprisonment after violating probation. 560 U.S. 48, 57 (2010).[8] The Court struck down the sentence as cruel and unusual, holding that the Eighth Amendment forbids the sentence of life without parole for a juvenile offender convicted of a nonhomicide offense. Id. at 74. The Court reasoned that while the Eighth Amendment "does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life[,] [i]t does forbid States from making the judgment at the outset that those offenders will never be fit to reenter society." Id. at 75. Rather, states must "give [juvenile] defendants . . . some meaningful opportunity to obtain release based upon demonstrated maturity and rehabilitation." Id.

Graham is clearly distinguishable from the instant case and does not alter our analysis of the Defendant's sentence. First, Graham's holding is limited to sentences imposed on juvenile offenders. Id. at 63, 74-75. The Graham Court was highly concerned with imposing the most severe penalties on offenders who committed crimes as juveniles, emphasizing that juveniles are less culpable than adult offenders and "more capable of change." Id. at 68. The Court reasoned that "[f]rom a moral standpoint, it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." Id. (citing Roper v. Simmons, 543 U.S. 551, 570 (2005)). This same rationale does not hold true when applied to the Defendant. Although his "failings as a minor" impacted his career offender status, we cannot ignore the fact that the Defendant is an adult offender being held accountable for acts he committed as an adult. As a juvenile, the Defendant was given an opportunity at maturity and rehabilitation after being convicted of seven felony offenses.[9] Despite these opportunities, he chose to continue his criminal conduct into adulthood.[10]

---

[8] Because Florida abolished its parole system, see Fla. Stat. § 921.002(1)(e) (2003), the defendant's life sentence gave him no possibility of release unless granted executive clemency.

[9] The Defendant was on parole for his prior convictions at the time he committed the instant offenses.

[10] A number of federal courts have rejected similar challenges to the use of prior juvenile offenses to enhance sentences under the Armed Career Criminal Act, and although not binding, we find their reasoning persuasive in the instant case. See United States v. Hoffman, 710 F.3d 1128, 1233 (11th Cir. 2013) ("[I]t is a far different thing to prohibit sentencing a juvenile offender to a mandatory sentence of life imprisonment without parole than it is to prohibit consideration of prior youthful offenses when sentencing criminals who continue their illegal activity into adulthood.") (internal quotation marks and citations omitted); United States v. Rich, 708 F.3d 1135, 1141 (10th Cir. 2013) ("Regardless of the inability of minors
(continued...)

Moreover, while the Defendant's sentence is indeed lengthy, he is not the recipient of a life sentence without the possibility of parole. The <u>Graham</u> Court, consistent with Supreme Court precedent, reiterated that a sentence of life without the possibility of parole is "'the second most severe penalty permitted by law.'" <u>Id.</u> at 69 (quoting <u>Harmelin v. Michigan</u>, 501 U.S. 957, 1002 (1991) (opinion of Kennedy, J.)). In addition to the Defendant's adult status, we likewise cannot "ignore the possibility that he will not actually be imprisoned for the rest of his life." <u>Rummel v. Estelle</u>, 445 U.S. 263, 280-81 (1980) (rejecting an Eighth Amendment challenge to a life sentence with the possibility of parole for a defendant's third nonviolent felony); <u>State v. Tavaria Merritt</u>, No. M2012-00829-CCA-R3-CD, 2013 WL 6505145, at *5 (Tenn. Crim. App. Dec. 10, 2013) ("[S]tate and federal courts have overwhelmingly refused to extend <u>Graham</u> to juvenile offenders who were not sentenced to life without the possibility of parole but nonetheless received lengthy sentences that might prevent their release."). <u>Graham</u>'s limited holding provides no relief to the Defendant.

The Defendant also challenges the length of his sentences but concedes that his argument is predicated upon this court finding that the trial court erred in sentencing the Defendant as a career offender. Indeed, upon finding the Defendant to be a career offender, the trial court was required to sentence the Defendant to the maximum sentence within Range III for his convictions. T.C.A. § 40-35-108(c). Accordingly, this issue is without merit.

**B. Consecutive Sentencing.** Finally, the Defendant challenges the trial court's imposition of partial consecutive sentences based upon its finding that the Defendant is a "dangerous offender." <u>See</u> T.C.A. § 40-35-115(b)(4).[11] He argues that proof that he committed multiple dangerous crimes is not sufficient to warrant consecutive sentencing, and the State failed to prove that consecutive sentencing is necessary to protect the public as required by <u>State v. Wilkerson</u>, 905 S.W.2d 933 (Tenn. 1995), and <u>State v. Pollard</u>, 432 S.W.2d 851 (Tenn. 2013).

---

[10](...continued)
to fully understand the consequences of their actions, adults facing enhanced sentences based, only in part, on acts committed as juveniles have had the opportunity to better understand those consequences but have chosen instead to continue to offend."); <u>see, e.g.</u>, <u>United States v. Scott</u>, 610 F.3d 1009 (8th Cir. 2010) (declining to extend <u>Graham</u> to the use of prior convictions committed as a juvenile to enhance the sentence of a convicted adult).

[11] The Defendant acknowledges that his sentence in count 3 for employing a firearm during the commission or attempt to commit a dangerous felony is required to be served consecutively. T.C.A. § 39-17-1324(e)(1).

Where a defendant is convicted of one or more offenses, the trial court has discretion to decide whether the sentences shall be served concurrently or consecutively. T.C.A. § 40-35-115(a). The Tennessee Supreme Court has held, "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple sentences to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of seven categories enumerated in Code section 40-35-115(b). Those categories include:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b) (2006). An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense." T.C.A. § 40-35-102(1); see State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002). In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed." T.C.A. § 40-35-103(2); see Imfeld, 70 S.W.3d at 708.

Where a trial court imposes consecutive sentencing based upon a finding that the defendant is a "dangerous offender," the trial court must make additional factual findings because this factor is "'the most subjective and hardest to apply.'" Imfeld, 70 S.W.3d at 708 (quoting State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999)). The Tennessee Supreme Court explained:

> Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender. In addition, the Sentencing Reform Act [of 1989] requires the application of the sentencing principles set forth in the Act applicable in all cases. The Act requires a principled justification for every sentence, including, of course, consecutive sentences.

Pollard, 432 S.W.3d at 863 (quoting State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995)). Therefore, when imposing consecutive sentences pursuant to the dangerous offender classification, the trial court must conclude that the proof establishes that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." Id. (quoting Wilkerson, 905 S.W.2d at 938). "When trial courts fail to include the two additional findings before classifying the defendant as a dangerous offender, they have failed to adequately provide reasons on the record to support the imposition of consecutive sentences." Id.

In this case, the trial court imposed consecutive sentencing after finding that the Defendant was a dangerous offender. See T.C.A. § 40-35-115(b)(4). In making its determination, the court stated:

> The Court finds that the [D]efendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. The Court finds this factor applies as an aggregate term is necessary to appreciate the seriousness of this offense and is necessary to protect the public from further serious criminal conduct by [the Defendant]. The Court finds consecutive

sentencing is reasonably related to the severity of this offense based upon the fact that the [D]efendant and a second assailant used a weapon and fired multiple shots at the victim, rushing him in the store which was open to the public at the time. Based upon this finding, the Court orders Counts one and two to be served concurrently with one another but consecutively to Count Five.

The record shows that the trial court made the additional factual findings required to determine that the Defendant was a dangerous offender. The court emphasized the serious nature of the offenses involved and the danger it presented to the public, highlighting that the Defendant fired multiple shots at the victim in the Lewis Street Market while it was open to the public. The court stated on the record that it found consecutive sentencing was warranted to "appreciate the seriousness of this offense" and "protect the public from further serious criminal conduct" by the Defendant. Cf. Wilkerson, 905 S.W.2d at 938 (holding that the trial court's conclusory statement that "the proof in the record indicates . . . [the defendant] is a dangerous . . . offender, and there was little or no regard for the value of human life" was insufficient to impose consecutive sentencing). Thus, we conclude that the trial court properly exercised its discretion in ordering the Defendant to serve his sentences consecutively.

In sum, the record reflects that the trial court carefully considered the evidence, the nature of the criminal conduct involved, the presentence report, and the purposes and principles of sentencing prior to imposing consecutive, within-range sentences of confinement. Therefore, the Defendant has failed to establish that the trial court abused its discretion in imposing his sentences and he is not entitled to relief.

## CONCLUSION

Upon a thorough review of the record, we affirm the judgements of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE